Michael W. Sanft (8245)
SANFT LAW
411 E. Bonneville Ave., Suite 360
Las Vegas, Nevada 89101
(702) 497-8008 (office)
(702) 297-6582 (facsimile)
michael@sanftlaw.com
*Attorney for Defendant Michele Fiore*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> MICHELE FIORE, <br><br> Defendant. | Case No. 2:24-cr-0155-JAD-DJA <br><br> **DEFENDANT'S EXHIBIT LIST TO HER MOTION IN LIMINE TO EXCLUDE GOVERNMENT'S INTENDED USE OF EVIDENCE IDENTIFIED IN ITS 404(b) NOTICE (ECF NO. 30)** |

Defendant MICHELE FIORE, through her attorney of record, Michael Sanft, respectfully submits the following exhibit list to her motion in limine to exclude the Government's intended use of evidence identified in its 404(b) notice be sealed (ECF No. 30).

Dated: September 13, 2024.

By: _____
Michael Sanft, Esq.
*Attorney for Michele Fiore*

# EXHIBIT A

FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
# RECEIPT FOR PROPERTY

Case ID:    56E-LV-3181616

On (date)    ~~1/26/2021~~ 01/27/2021        item(s) listed below were:
*LF* 01/28/2021

☒ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name)    Lillian Fiore

(Street Address)    6205 RED PINE COURT LAS VEGAS, NV 89130

(City)    LAS VEGAS, NV 89130

## Description of Item(s):

1 - SAMSUNG CELL PHONE MODEL:SM-N950U; SN: R38K109S7PZ

2 - APPLE IPHONE 7+ MODEL:MN562LL/A; S/N:C39TCQ9FHFYC; SCREEN HAS A CRACK

3 - IPHONE 11 PRO MAX MODEL: MWFG2LL/A; SN: FK1CC7W2N70K IN BROWN LUIS VITON CASE

4 - IPHONE XR MODEL:MT352LL/A; SN: FFWCC2SKKXKV, IN BLACK OTTER BOX

5 - LEGAL CORRESPONDENCE

6 - BLACK IN COLOR DIGILAND PERSONAL TABLET; MODEL: DL721-RB; SN: 161020721RB06330

7 - PLASTIC GOLDEN KNIGHTS BAG CONTAINING PAPERWORK AND RECETPTS

8 - SAMSUNG CHROME BOOK; SN:0JDB91GJ200418K; MODEL: XE500C13-K02US WITH CHARGER

9 - US PASSPORT IN NAME OF MICHEL FIORE #490561273

10 - RECIEPTS AND BLANK CHECKS

11 - FOUR (4) CREDIT/DEBIT CARDS

12 - PLASTIC SURGERY DOCUMENTS

13 - CAMPAIGN CONTRIBUTION RECORDS AND RECEIPTS

14 - SAMSUNG LAPTOP CPMPUTER MODEL:NP730QCJ; SN: 3ZFB9FAN703058D

15 - LG CELL PHONE MODEL: LG-M255; SN: 802CYJZ290132

16 - APPLE I PHONE MODEL: A1533; IMEI: 013848007442335

17 - EXPENSE REPORTS; TAXES, PAPERS

18 - PNY MICRO SD CARD

19 - SAN DISK CRUZER GLIDE 32 GB BLACK AND RED IN COLOR

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# RECEIPT FOR PROPERTY

20 - HP LAPTOP COMPUTER WITH CHARGER; S/N: 00196-87-469-530PRODUCT KEY: QY24H-W8JQB3DPBYQ4C2BR9H42

21 - DELL LAPTOP WITH CHARGER; SERVICE TAG: 258V162

22 - FINANCIAL LOG INS AND PASSWORDS, RECEIPTS

23 - RECEIPTS AND DOCUMENTS RELATED TO SINGAPOR TRIP

24 - DOCUMENTS RELATED TO FUTURE FOR NEVADANS PAC

25 - FLIGHT TO CHINA DOCUMENT

26 - LAPTOP FUJITSU; SN: R5X11240

27 - APPLE I PHONE MODEL: A1533; IMEI: 0138800084007299; WHITE IN COLOR

28 - CAMPAIGN FINANCE RECORDS AND BANK STATEMENTS

29 - NOTE REF: PAYING DORA

30 - APPLE IPHONE SILVER IN COLOR, MODEL: A1533; IMEI:013987000846173

31 - APPLE IPHONE MODEL:A1387; BLACK IN COLOR

32 - WD HD 500 GB MODEL:WD5000AADS-00S9B0; S/N: WCAV93890170

33 - PAPERWORK RECEIPTS

34 - RECEIPT

35 - PO BOXES INFORMATION

36 - WELLS FARGO RECEIPTFOR $2450.00

37 - THREE (3) USB DRIVES

38 - CHASE BANK FORECLOSURE DOCUMENTS

39 - RECEIPT

40 - RECEIPT AND ROOM KEY

41 - USB - SAN DISK CRUZER GLIDE 32 GB

42 - FINANCIAL DOCUMENTS / LETTERS

43 - CDR LABELED MICHELE FIORE CALLS AND TEXTS

44 - IPAD 64GB IMEI: 012930003268434; SN: DN6GMLECDFJ3

45 - CHECKBOOK

46 - IPAD S/N DN6SFR2MYDFJ3

47 - WALK THE TALK CALENDAR

48 - BLUE EXTERNAL HARD DRIVE MY PASSPORT ULTRA; SN: WXA1AB5FZLV2

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# RECEIPT FOR PROPERTY

49 - TWO (2) USBS

50 - 4GB USB

51 - CREDIT CARD STATEMENTS

52 - CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE RECEIPT

53 - CHASE DEPOSIT , AUTO INSURANCE

54 - LUIS VITON RECEIPT FOR $1840.00

55 - PAYSTUBS CHECKS DEPOSITS

56 - CHECKBOOKS

57 - DOCUMENTS

58 - DOCUMENTS -MISC

59 - APPLE DEVICEMODEL: A1097; SN:TE220093

60 - SAMSUNG CHROMEBOOK SN:05DB91GJ205719P; MODEL:XE500C13-K02US

61 - EXTRA PETTY CASH RECEIPTS NOT IN FOLDERS

62 - RECEIPTS

63 - GENERAL DOCUMENTS - IRS

64 - GREEN IN COLOR HEALTH BINDER WITH DOCUMENTS

65 - PAYMENT RECEIPTS

66 - RECEIPTS CHECKS, FINANCIAL DOCUMENTS

67 - BINDERS CONAINING YEARLY BILLS AND TRANSCRIPTS

68 - BINDERS CONTAINING PAYMENTS AND DOCUMENTS FOR HAMLET EVENTS AND PETTY CASH LOGS WITH RECEIPTS

69 - TRUTH IN POLITIC MAGAZINE

70 - DOCUMENTS / RECEIPTS

71 - LENOVO COMPUTER SN: CS01841099

72 - APPLE COMPUTER MODEL A1186; SN 157200NJUPZ

Received By: _____ (signature)

Received From: _____ (signature)

Printed Name/Title: _Cody Fryxell, SA_

Printed Name/Title: _Lui Fiore_

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

# RECEIPT FOR PROPERTY

**EXHIBIT B**

AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

# UNITED STATES DISTRICT COURT
### for the
### District of Nevada

U.S. MAGISTRATE JUDGE

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

THE RESIDENTIAL PREMISES LOCATED AT 6205 RED PINE COURT, LAS VEGAS, NEVADA – A1

)
)
)
)
)
)

Case No.    2:21-MJ-00073-VCF

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

THE RESIDENTIAL PREMISES LOCATED AT 6205 RED PINE COURT, LAS VEGAS, NEVADA – A1

located in the _____Las Vegas_____ District of _____Nevada_____, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachments A and B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:
Please see the Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I hereby attest and certify on _____ that the foregoing document is a full true and correct copy of the original on file in my office, and in my legal custody.

CAM FERENBACH
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

By _____ Deputy Secretary

_____
*Applicant's signature*

Cody Fryxell, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __/__/__

City and state:  Las Vegas, Nevada

CAM FERENBACH

_____
*Judge's signature*

Honorable Cam Ferenbach, U.S. Magistrate Judge
*Printed name and title*

FILED

2021 JAN 21 PM 1:05

U.S. MAGISTRATE JU...

# UNITED STATES DISTRICT COURT
### for the
### District of Nevada

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )       Case No       2:21-MJ-00074-VCF
)
THE PERSON KNOWN AS MICHELE FIORE – A2 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
THE PERSON KNOWN AS MICHELE FIORE – A2

located in the _____ Las Vegas _____ District of _____ Nevada _____ , there is now concealed *(identify the person or describe the property to be seized):*
Please see Attachments A and B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:
Please see the Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Cody Fryxell, Special Agent
*Printed name and title*

by telephone
Sworn to before me and signed in my presence.

Date: 1-21-21

CAM FERENBACH
*Judge's signature*

City and state: Las Vegas, Nevada

Honorable Cam Ferenbach, U.S. Magistrate Judge
*Printed name and title*

*(rotated right margin text):* I hereby attest and certify on ___ that the foregoing document is a full true and correct copy of the original on file in my office, and in my legal custody.

CAM FERENBACH
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

Deputy Secretary

By

FILED

# UNITED STATES DISTRICT COURT
### for the
### District of Nevada

2021 JAN 21 PM 1:05

U.S. MAGISTRATE JUDGE

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. **2:21-MJ-00075-VCF** |
| THE PERSON KNOWN AS SHEENA SIEGEL – A3 | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
THE PERSON KNOWN AS SHEENA SIEGEL – A3

located in the _____ Las Vegas _____ District of _____ Nevada _____, there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachments A and B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:
Please see the Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*I hereby attest and certify on ___1-21-21___ that the foregoing document is a full true and correct copy of the original on file in my office, and in my legal custody.*

CAM FERENBACH
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

_____ Deputy _____ Secretary

By _____

_____
*Applicant's signature*

Cody Fryxell, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence. *by telephone*

Date: ___1-21-21___

CAM FERENBACH
_____
*Judge's signature*

City and state: Las Vegas, Nevada

Honorable Cam Ferenbach, U.S. Magistrate Judge
*Printed name and title*

FILED

2021 JAN 21 PM 1: 05

U.S. MAGISTRATE [...]

NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar No. 13644
STEVEN W. MYHRE
Assistant United States Attorney
Nevada Bar No. 9635
CHRISTOPHER BURTON
Assistant United States Attorney
Nevada Bar No. 12940
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: 702.388.6298 / Fax: 702.388.6418
Steven.Myhre@usdoj.gov
Christopher.Burton4@usdoj.gov

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RESIDENTIAL PREMISES LOCATED AT 6205 RED PINE COURT, LAS VEGAS, NEVADA – A1 | Case No.   2:21-MJ-00073-VCF<br><br>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT ISSUED UNDER RULE 41, FEDERAL RULES OF CRIMINAL PROCEDURE**<br><br>**(Filed Under Seal)** |
| IN THE MATTER OF THE SEARCH OF THE PERSON KNOWN AS MICHELE FIORE – A2 | 2:21-MJ-00074-VCF<br>Case No.<br><br>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT ISSUED UNDER RULE 41, FEDERAL RULES OF CRIMINAL PROCEDURE**<br><br>**(Filed Under Seal)** |

1

| IN THE MATTER OF THE SEARCH OF THE PERSON KNOWN AS SHEENA SIEGEL – A3 | Case No. |
|---|---|
| | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT ISSUED UNDER RULE 41, FEDERAL RULES OF CRIMINAL PROCEDURE** |
| | **(Filed Under Seal)** |

I, Cody Fryxell, Special Agent, Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am submitting this affidavit in support of a warrant to search the following: (1) the residential premises located at 6205 Red Pine Court, Las Vegas, Nevada; (2) the person of Michele Fiore; and (3) the person of Sheena Siegel. The warrant seeks authorization to search the aforementioned places to locate and seize the items listed and identified herein, which items constitute evidence and instrumentalities of the federal violations listed herein.

2. I have been a Special Agent with the FBI since September 2017, and currently serve in the Las Vegas Field Office where I am assigned to investigate allegations of fraud, public corruption, and violations of civil rights. Prior to becoming a Special Agent with the FBI, I served as an Infantry Officer in the United States Army. I graduated from the FBI Academy and have received formal and informal training on seeking and executing federally authorized search warrants.

3. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is

2

empowered by law to conduct investigations of, and make arrests for, alleged violations of Title 18, United States Code. As an FBI Special Agent, I have obtained and participated in the execution of numerous court-authorized search warrants.

4. I am currently conducting an investigation into alleged violations of Title 18, United States Code, Sections 1343 (Fraud by Wire) and 1956 (Money Laundering) (hereinafter the "Subject Offenses") that may have been committed by Michele Fiore (hereinafter "Fiore"), Sheena Siegel, and other such persons, known and unknown, who may be working with them, all as set forth more fully below.

5. I submit this Affidavit in support of an application for a warrant issued under Federal Rule of Criminal Procedure 41 to authorize the search of the persons, premises, and locations described herein and at Attachment A-1, A-2, and A-3, and such places, containers, electronic devices, and electronic storage medium located there in order to search for and seize the items described with particularity at Attachment B.

6. As explained herein, the items described at Attachment B include documents or communications constituting evidence of violations of the Subject Offenses as stored and maintained in whatever form, to include electronic medium. As a result, this warrant seeks authorization to seize and search any electronic devices and electronic storage medium, as further defined herein, as may be located on or in the premises or persons to be searched and that may reasonably serve to store or transmit electronic communications or documents authorized to be seized at Attachment B. The search of the electronic devices will be conducted in accord with the authorization set out at Attachment C.

7. This Affidavit is based on information obtained during and in the course of my investigation as made known to, or obtained by, me personally, or as obtained, or

3

communicated to me, by others assigned to investigate this matter. I submit this Affidavit for the limited purpose of establishing probable cause and it does not purport to include all the facts or information obtained in the course of this investigation.

### SUBJECT OFFENSES

8.   As set forth below, there is probable cause to believe that in and on the places to be searched are located evidence of violations of the following federal laws, referred to hereinafter as "the Subject Offenses:"

Title 18, United States Code, Section 1343, which provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Title 18, United States Code, Section 1956, which provides in relevant part as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of a specified unlawful activity . . . with the intent to promote the carrying on of the specified unlawful activity; or . . . knowing that the transaction is designed in whole or in part – to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

4

**PLACES TO BE SEARCHED**

9. As set forth below, there is probable cause to believe that evidence of violations of the Subject Offenses will be found on the persons or at the premises described below and at Attachments A-1 through A-3 to the Search Warrant:

**A-1:** The premises located at 6205 Red Pine Court, Las Vegas, Nevada, 89130, further described in Attachment A-1, and such electronic devices, electronic storage medium, cabinets, drawers, and containers, located therein as are reasonably likely to hold, store, conceal, or maintain, the items to be seized as set forth with particularity in Attachment B.

**A-2:** The person of Michele Fiore as further described in Attachment A-2, wherever she may be found, to search for and seize the items to be seized as set forth with particularity in Attachment B. The search of Fiore shall include any and all clothing and personal belongings, electronic devices, backpacks, wallets, briefcases, purses, and bags that are likely to hold, store, conceal, and maintain the items to be seized and that are within Fiore's immediate vicinity and control at the time and place where she is found and the search warrant is executed. The search shall not include a strip search or a body cavity search.

**A-3:** The person of Sheena Siegel, as further described at Attachment A-3, wherever she may be found, to search for and seize the items to be seized as set forth with particularity in Attachment B. The search of Siegel shall include any and all clothing and personal belongings, electronic devices, backpacks, wallets, briefcases, purses, and bags that are likely to hold, store, conceal, and maintain the items to be seized and that are within Siegel's immediate vicinity and control at the time and

5

place where the search warrant is executed. The search shall not include a strip search or a body cavity search.

**ITEMS TO BE SEIZED**

10. As set forth below, there is probable cause to believe that the following items set forth below and at Attachment B to the Search Warrant constitute evidence and instrumentalities of violations of the Subject Offenses.

**For the period of July 2015 to Present:**

1. All documents relating to the scheme to defraud as set forth in the affidavit.

2. All documents relating to any financial transaction arising from the scheme to defraud as set forth in the affidavit.

3. All documents related to the proceeds of the scheme to defraud as set forth in the affidavit.

4. All documents related to the disposition of the proceeds of the scheme to defraud as set forth in the affidavit.

5. All documents related to the acquisition of property with the proceeds of the scheme to defraud as set forth in the affidavit.

6. All documents relating to ownership and use of electronic devices used in the scheme to defraud as set forth in the affidavit.

7. All communications relating to the scheme to defraud as set forth in the affidavit.

8. All communications relating to any financial transaction arising from the scheme to defraud as set forth in the affidavit.

6

9. All communications related to the disposition of the proceeds of the scheme to defraud as set forth in the affidavit.

10. All communications relating to electronic devices used in the scheme to defraud as set forth in the affidavit.

11. All documents related to any electronic devices used in the scheme to defraud as set forth in the affidavit.

12. All electronic devices and electronic storage medium used in the scheme to defraud as set forth in the affidavit.

13. All documents and communications related to lease agreements for 6205 Red Pine Court, Las Vegas, NV.

14. All documents and communications related to invoices for goods or services provided by Hamlet Events.

15. All documents and communications related to invoices for goods provided to or services performed for the Fiore for Nevada campaign.

16. All documents and communications related to invoices for goods or services provided to the Future for Nevadans, PAC.

17. All documents and communications related to goods or services provided by Sheena Seigel.

18. All documents and communications with Sheena Seigel related to payments of money to or from Fiore for Nevada, Future for Nevadans, Truth in Politics, or Politically Off the Wall.

11. For purposes of this Warrant:

a. The word **"communication"** is defined as the exchange and/or transmission of thoughts, messages, ideas, concepts, or the like by use of letters, words, signals, or signs transmitted by any means, including, without limitation, paper or letter correspondence, notes, memos, marginalia, and electronic transmissions and signals commonly referred to as e-mail, text messages, instant messages, tweets, voice-mail, voice-messaging, private messages, video calling history, "Friend" requests, status updates; Instagram messages, electronic recordings, or other electronic means of transmitting information, including all associated metadata if stored and/or recorded in an electronic storage medium.

b. The word **"document"** is defined as any information, communication, data, datapoint, or historical event recorded in any form or medium (paper or electronic), including, without limitation: emails, SMS messages, chat messages, phone call records, activity logs, photographs, status updates, comments, "Friend" lists, "Friend" requests, "News Feed information," IP logs, location monitoring data, "Neoprints," videos, "likes," chat histories, gifts, pokes, tags, memoranda, letters, transmittals, notes, compilations, summaries, charts, receipts, invoices, bills, deposit slips, bank statements, checks (front and back), forms, ledger entries, journal entries, diary entries, calendar entries, database entries, drawings and/or diagrams, and any and all associated metadata associated with information stored and/or recorded in an electronic storage medium.

8

## FACTS IN SUPPORT OF PROBABLE CAUSE

**A.     Background.**

12.     Michele Fiore presently serves in elected public office as Councilwoman of Ward 6 with the Las Vegas City Council, a political subdivision of the State of Nevada. Before serving in the Las Vegas City Council, Fiore served in the Nevada State Assembly as an Assemblywoman, representing State Assembly, District 4, from 2012 to 2016.

13.     Before running for City Council, Fiore ran for election to the United States Congress as a representative of Nevada's Third Congressional District. She named her campaign for that office as "Fiore for Congress." She was defeated in her party's primary election in June 2016.

14.     Fiore declared her candidacy for City Council on January 24, 2017, filing a Declaration of Candidacy that listed her campaign headquarters as her residence address of 6205 Red Pine Court, Las Vegas, NV 89130. She maintained the campaign name: **Fiore for Nevada** (hereinafter "FN") and listed Ryan Hamilton as her campaign manager. She won election to the City Council in June 2017.  Unless noted otherwise, the events described below relate to her 2017 campaign for City Council, and thereafter, to the present.

15.     Nevada law authorizes a political officeholder and/or a candidate for political office (collectively referred to herein as a "candidate") to solicit and receive campaign contributions from Nevada citizens and entities. In the case of money contributions, Nevada law requires a candidate to segregate the contributions from a candidate's personal funds and assets, requiring the candidate to establish a separate and dedicated account with a financial institution in the name of the candidate's campaign.

16. Nevada law further requires the candidate to expend the contributions only for goods and services rendered to the campaign or for a political purpose. Nevada law prohibits the expenditure of campaign contributions for the personal use and benefit of the candidate.

17. Nevada law further requires every campaign to publicly report all campaign contributions and expenses in excess of $100 to the Nevada Secretary of State's Office via a "Contributions and Expenses Report" (hereinafter "C&E Report"). The C&E Report is a public record and, in the normal course of business, is filed electronically at designated times throughout the year.

18. Nevada law also authorizes the formation of Committees for Political Action (also referred to as "PACs"). Like political campaigns, a PAC, through its designated officer or officers, may solicit and receive money contributions from Nevada citizens and entities, provided the PAC funds are segregated and maintained in a separate and dedicated financial account.

19. Nevada law requires the PAC to expend contributions only for the declared political purposes of the PAC. Nevada law prohibits the expenditure of PAC contributions for the personal use and benefit of PAC members or its officers.

20. Nevada law requires the PAC, through its officers, to report all cumulative contributions and expenditures in excess of $1,000 in a C&E report filed with the Nevada Secretary of State. Fiore created and was an officer and member of a Nevada PAC named: **Future for Nevadans** (hereinafter "FFN").

21. At all times relevant in this Affidavit, Fiore signed and filed, and caused the filing of, C&E Reports for FN and FFN, in which she acknowledged compliance with

10

Nevada campaign finance laws, including the laws set out above, during the reporting period.

**B.      Summary of Scheme to Defraud.**

22.      As demonstrated below, there is probable cause to believe that Fiore used interstate wire communications to engage in a scheme to defraud FN and FFN contributors by fraudulently collecting and maintaining money contributions made for campaign and PAC purposes and converting them to her personal use and benefit, all in violation of Title 18, United States Code, Section 1343.

23.      Furthermore, there is probable cause to believe that Fiore conducted financial transactions, and caused financial transactions to be conducted, in order to promote the carrying on of the scheme to defraud, and to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the scheme to defraud, knowing that the transactions were so designed and involved the proceeds of fraud, all in violation of Title 18, United States Code, Section 1956.

24.      As a part of the scheme to defraud, Fiore established FN and FFN and held them out as authorized to solicit and collect money contributions for campaign and PAC purposes as authorized under Nevada law.

25.      As a further part of the scheme to defraud, Fiore established separate deposit and checking accounts for FN and FNN, making herself a signatory to the accounts and maintaining complete control of, and authority over, the disposition of funds from the accounts.

26.      As a further part of the scheme to defraud, Fiore collected contributions made to FN and FFN and deposited them into their corresponding deposit and checking

11

accounts, holding the contributions out as dedicated solely to the purpose of holding and expending the funds for campaign and PAC purposes.

27. As a further part of the scheme to defraud, after obtaining and depositing the contributions, Fiore converted them, and caused the conversion of them, to her personal use and benefit and not for the use and benefit of her political campaign or the political purposes of the PAC.

28. As a further part of the scheme to defraud, Fiore converted the funds to her personal use and benefit by, among other things, negotiating checks to cash, withdrawing cash from ATMs, transferring funds to her personal checking account, purchasing cashier's checks and money orders in order to pay rent on her personal residence, make automobile payments, and pay for credit card charges for personal expenses like trips and vacations.

29. As a further part of the scheme to conceal and disguise, Fiore created or maintained two limited liability corporations under Nevada law, naming them Politically Off the Wall (hereinafter "POTW") and Truth In Politics, the Magazine (hereinafter "TIP").

30. As a further part of the scheme to conceal and disguise, Fiore opened deposit and checking accounts in the names of these two entities, making herself a signatory to the accounts and maintaining complete control of, and authority over, the disposition of funds from these accounts.

31. As a further part of the scheme to conceal and disguise, Fiore used TIP and POTW as conduits through which money was funneled from FN and FFN to her personal use and benefit by, among other things, paying rent for her personal residence.

12

**C.**    **Facts Establishing the Scheme to Defraud.**

32.    At all times relevant, the following facts were derived from evidence adduced during and in the course of the investigation of this matter.

*(1)*    *Records Analyzed.*

33.    The FBI obtained bank and C&E records related to FN and FFN, as well as the bank records related to the conduit entities, TIP and POTW. The FBI also obtained and analyzed bank records related to the personal accounts of Fiore, Sheena Siegel, and Siegel's entity, Hamlet Events ("HE"), and Savanah Kaime. These records, which included all bank statements and checks associated with the financial accounts, spanned the relevant time frames delineated further below.

34.    During the course of this investigation, these records have been compiled, organized, reviewed, and analyzed by FBI special agents, support technicians, and forensic accountants and, where relevant, are summarized below.

<u>**Campaign and PAC Accounts**</u>

35.    **FN Campaign Account**. On July 29, 2015, Fiore opened and maintained a deposit and checking account with Bank of Nevada, a subsidiary of Western Alliance Bank (hereinafter referred to as "WAB"), under the account name of Fiore for Nevada. FN account records showed that Fiore was the sole signatory on the account, which listed a mailing address of 6205 Red Pine Ct. Las Vegas, NV 89130, and an email address of michele@votefiore.com. The email of michele@votefiore.com is hosted by the webserver: godaddy.com.

36.    **FFN PAC Account**. On February 28, 2017, Fiore organized Future For Nevadans as a PAC under the laws of the State of Nevada, listing Fiore as its only officer

13

and stating "community outreach" as its political purpose and function. On the same day, Fiore created and maintained a separate deposit and checking account with WAB under the account name of Future for Nevadans, listing herself as the only signatory to the account with a mailing address of: 6205 Red Pine Ct. Las Vegas, NV 89130.

**Conduit Entities**

37. **TIP:** On September 29, 2015, Nevada Corporate Headquarters Inc. created and registered Truth in Politics, The Magazine as a limited liability corporation under the laws of the State of Nevada, listing a mailing address of P.O. Box 27740, Las Vegas, NV 89126, and Fiore as the Manager or Managing Member.

38. On October 29, 2015, Fiore opened and maintained a checking and deposit account with WAB under the account name of Truth in Politics The Magazine LLC, listing Fiore and her mother Lillian Fiore (also referred to, or known as, "L. Fiore") as signatories, with a mailing address of 6205 Red Pine Court, Las Vegas, Nevada 89130 and an email address of michele@votefiore.com.

39. **POTW:** On February 22, 2017, Nevada Corporate Headquarters Inc. created and registered Politically Off the Wall as a limited liability corporation under the laws of the State of Nevada, listing a mailing address of P.O. Box 27740, Las Vegas, NV 89126, and Janette Hill (hereinafter "Hill") as the Manager or Managing Member. C&E Reports filed with the Nevada Secretary of State's Office listed the mailing address for POTW as 6205 Red Pine Court, Las Vegas, NV.

40. On March 1, 2017, Fiore opened and maintained a deposit and checking account with WAB for POTW, listing Fiore and Hill as the signatories on the account and Fiore as a member of POTW. The initial $4,100 used to establish the account was provided

14

in the form of two checks from FN totaling $2,500, and one check from FFN for $1,600. None of these payments was reported on C&E Reports for FN or FFN. The account listed the POTW mailing address as 6205 Red Pine Court, Las Vegas, NV.

41. **HE:** On October 16, 2018, Nevada Corporate Headquarters Inc. created and registered Hamlet Events ("HE") as a limited liability corporation under the laws of the State of Nevada, listing a mailing address of 7251 West Lake Mead, Blvd., Suite 300, Las Vegas, NV and Sheena Siegel as the Manager or Managing Member. HE maintained a bank account at WAB, listing Siegel as the signatory with a mailing address of 7251 West Lake Mead Blvd., Suite 300, Las Vegas, NV.

**Personal Accounts**

42. Fiore maintained a personal deposit and checking account with Chase Bank. The account listed Fiore and L. Fiore as signatories to the account, with a mailing address of 6205 Red Pine Court, Las Vegas, NV. As indicated above, "L. Fiore" is known as Lilian Fiore, Michele Fiore's mother. Through surveillance and other records, the investigation revealed that Lilian Fiore resided at 6205 Red Pine Court, Las Vegas, NV.

43. Sheena Siegel maintained two personal deposit and checking accounts and three savings accounts with Wells Fargo. One checking account listed Siegel as a sole signatory. One checking and one savings account listed Siegel and her husband David Siegel, as signatories. Two of the savings accounts were associated with Siegel's minor children. All of the accounts listed a mailing address of 6204 West Lanning Lane, Las Vegas, NV.

**(2)** *Payouts from FN and FFN to Fiore and Her Daughters.*

44. The bank records from FN and FFN analyzed for the time periods indicated below reveal that Michele Fiore paid out campaign and PAC contributions from these accounts directly to herself or her daughters, the payouts frequently taking the form of cash withdrawals or checks negotiated to cash.

45. From August 2015 to March 2020, Fiore paid out in excess of $80,000 from FN to herself, making over 200 withdrawals of varying amounts, using checks negotiated to cash, debit cards, and ATM withdrawals.

46. From June 2017 to March 2020, Fiore paid out in excess of $69,000 from FN to Sheena Siegel by writing more than 50 checks in varying amounts which, in many instances, Siegel quickly negotiated to cash.

47. Fiore followed a similar convention for FFN. From May 2018 to March 2020, Fiore paid out approximately $37,000 from FFN to herself by negotiating to cash more than 16 checks written to herself in varying amounts.

48. From January 2018 to March 2020, Fiore paid out in excess of $183,000 from FFN to Sheena Siegel by writing more than 120 checks to Siegel in varying amounts, which checks were quickly negotiated to cash.

49. From March 2018 to November 2019, Fiore paid out in excess of $15,000 from FFN to another daughter, Savanah Kaime, by writing approximately 20 checks to her in varying amounts.

50. As stated above, Sheena Siegel established a catering business, HE, in October 2018. From September to December 2019, Fiore paid out in excess of $10,000 to HE from FFN. A catering company may provide legitimate services for a PAC or a PAC

16

activity. The investigation to date has not revealed evidence to explain the cash or check to cash payment to Sheena Siegal in her individual capacity.

**(3)    *Payouts from FN and FFN to TIP and POTW.***

51.    The bank records of FN, FFN, TIP, and POTW reveal numerous payouts from the campaign and PAC accounts to the TIP and POTW entities, using checks, cash deposits, and online transfers between financial accounts. I know from training and experience that online transfers of money involving major financial institutions, such as those indicated herein, require interstate electronic transmissions to effect the transaction.

52.    From January 2017 to March 2020, Fiore paid out approximately $237,000 from FN to TIP and POTW, using checks, online transfers, and cash deposits.  Of this total, only approximately $133,000 was reported on the FN C&E Reports as campaign expenses, approximately $103,000 in payouts was not reported, and one payout of $1,500 is not yet subject to being reported.

53.    From March 2017 to March 2020, Fiore paid out in excess of $87,000 from FFN to POTW, using checks and online bank transfers. Several of the payouts to POTW from FFN were included on FFN's C&E Reports as campaign expenses.

54.    After making payouts to these entities, Fiore used the TIP and POTW accounts to make downstream payouts to herself and her daughters, as shown in detail below.

**(4)    *Payouts from TIP and POTW to Fiore's Personal Benefit.***

55.    In each of the instances below, Fiore initiated the payouts from TIP and POTW by online transfers, cash withdrawals, or checks, where each of the transactions

17

occurred on or about the same day, or within a few business days, following a payout from either FN or FFN.

56. From January 2017 to February 2020, Fiore made cash withdrawals from TIP for an approximate total of $42,000, where each of the withdrawals was preceded by a payout from FN or FFN.

57. From March 2017 to March 2020, Fiore made cash withdrawals or transfers to her personal account from POTW for an approximate total of $14,600, where each of the withdrawals was preceded by a payout from FN or FFN.

58. From April 2017 to February 2020, Fiore wrote checks from POTW to Sheena Siegel for an approximate total in excess of $52,000, where each of the checks was preceded by a payout from FN or FFN. In many instances, Siegel negotiated the check to cash almost immediately after the date of the check.

59. From June to December 2017, Fiore wrote three checks from TIP to Sheena Siegel for an approximate total of $3,400, where each of the checks was preceded by a payout from FN.

60. From August 2017 to December 2019, Fiore wrote checks from POTW to Savanah Kaime for an approximate total in excess of $25,000, where each of the checks was preceded by a payout from FN or FFN.

**(5)    *Totals from All Sources.***

61. From its inception in November 2015 to March 2020, the total inflow of funds to FN was approximately $917,350, the vast majority of which are consistent with political contributions.

18

62. From its inception in February 2017 to March 2020, the total inflow of funds to FFN was approximately $655,000, the vast majority of which are consistent with political contributions.

63. Based on the analysis above, Fiore received in excess of $229,000 from all relevant accounts – FN, FFN, TIP, and POTW – during the life of these accounts, until March 2020. During the same period, Sheena Siegel received in excess of $308,000 and Savanah Kaime received in excess of $37,000 from these accounts.

64. From March to November 2020, FN received approximately $132,000 in contributions, of which Fiore withdrew in excess of $42,000 in cash, through either negotiating checks to cash or making ATM withdrawals. For the same time period, FFN received approximately $185,500 in contributions of which Fiore withdrew in excess of $29,000 in cash, through either negotiating checks to cash or making ATM withdrawals.

(6) *TIP and POTW as Conduits To Funnel Contributions To Fiore.*

65. As shown above, Fiore listed some of the payouts to TIP and POTW as legitimate expenditures on the C&E reports for FN and FFN. However, as shown below, transactions in the TIP and POTW accounts are consistent with their use as conduits to disguise payouts of contributions used for personal use and benefit.

66. I know from training and experience that most legitimate providers of goods and services, including consultants, require payment by check or other credit instruments for tax and record keeping purposes. No evidence has been revealed in the investigation to date to explain the frequency and nature of these cash or check to cash payments.

67. After Fiore's election in June 2017, TIP's primary source of funds derived almost exclusively from deposits/transfers originating from FN, FFN, and POTW, and not

19

from recurring customers. In the months leading up to Fiore's election, there were several non-material deposits from individuals and entities that appear to be consistent with campaign contributions and not business activity. Following the deposits to TIP, Fiore routinely drew the balance to near zero and overdrew the account on several occasions.

68. As shown above, most of the payouts from the TIP account went to herself (in the form of cash, cash deposits, or online transfers to her personal account) or to her daughters. No evidence has been revealed to date to demonstrate a legitimate business or political purpose to move money from FN and FFN to TIP and then to Fiore or her daughters.

69. Similar to TIP, POTW's primary source of funds derived almost exclusively from FN and FFN, although there were non-material deposits from individuals that appear to be consistent with campaign contributions and not business activity. Following the deposits, Fiore routinely drew POTW's balance to near zero and overdrew the account on several occasions. Once lowered to near zero, Fiore replenished the POTW account with deposits from FN or FFN, ranging from $200 to $7,500 per deposit.

70. Fiore claimed on her C&E reports that some of the payments to POTW were for "expenses related to consultants;" however, those too are consistent with the cash or check to cash payments revealed in the TIP account. By way of example, in December 2017, Fiore conducted four online transfers from FN to POTW. All of the transfers were reported on the corresponding C&E Report as "expenses related to consultants." However, soon after the online transfers to POTW, Fiore wrote checks from the POTW account to her daughters, which were then negotiated to cash the same day. During this period, POTW's only source of income derived from FN.

20

71. In June 2017, a citizen filed a complaint with the Nevada Secretary of State's Office, claiming that Fiore used POTW to funnel campaign funds for her personal living expenses.

72. In a June 2017 letter response to the complaint, Fiore acknowledged that she was prohibited from using campaign contributions for personal use and benefit and denied using them for that purpose. She wrote that POTW "was created and is to be a full-service consulting company." She further stated that she "directly managed [her] door-to-door canvassing effort" and that POTW "allowed [her] to provide [her] walkers with a level of anonymity," implying that she paid her door-to-door canvassers as a legitimate campaign expense using funds from POTW. She concluded her response by stating that she did not use POTW to receive compensation from her campaign and that POTW "functions as a consulting company to provide canvassers and telephone direct voter contacts."

73. She further forwarded to the Nevada Secretary of State copies of invoices from POTW to FN in the amounts of $20,000, $5,500, $8,000, $3500, and $7000, covering the period from April to May 2017. The invoices do not delineate the services provided by POTW; they simply state, "Ground Game" and/or "Democrat Ground game."

74. In a letter response to the complaint, the Nevada Secretary of State wrote that his office "reviewed invoices, checks and other business records maintained by the company," which revealed "no disbursement for [Fiore's] personal use or benefit." The letter further stated that "funds traceable to campaign contributions were expended by the company for door-to-door and telephone contact services provided by third parties in the lead up to the June 2017 City of Las Vegas municipal general election."

21

75. Documents obtained from the Nevada Secretary of State's Office in the course of this investigation showed that the Secretary of State's investigation of this matter included documents provided by Fiore that included invoices purportedly generated by POTW.

76. POTW bank account records obtained by the FBI show payments consistent with payments to third parties serving as door-to-door and telephone contacts for a political campaign during the March to June 2017 time period; however, the analysis of these same records also reveals the pattern of cash or check to cash payments to herself and her daughters.

77. There is no evidence to suggest that Fiore provided the Nevada Secretary of State's Office with bank account records related to TIP and POTW or records related to the numerous transfers of money to and from and between the accounts as delineated.

(7) *Contributions Used to Pay Rent and Other Personal Expenses.*

78. Further analysis of the financial records showed that on many occasions, the cash received by Fiore and Siegel from FN, FFN, TIP, and POTW was used to pay for rent and other expenses that personally benefitted Fiore.

## Rent

79. Analysis of the FN account showed a check written to an individual named E.L. on November 25, 2016, in the amount of $5,500. This expenditure was not listed on the FN C&E Report as a campaign expenditure and E.L. is not named in any C&E Report as the recipient of any campaign or PAC expenditure. Further analysis of the check revealed that it was deposited into E.L.'s checking account held with Chase Bank. Further

22

investigation revealed that E.L. is listed on property records as the owner of 6205 Red Pine Court, Fiore's current residence.

80. The FBI obtained bank records related to E.L's account with Chase Bank. An analysis of that information revealed a series of recurring monthly deposits totaling $2,450 per month throughout the period of January 2017 to May 2020, for a total sum in excess of $98,000 in deposits. The deposits were made with cashier's checks or money orders. In many instances, the memo/address line of these instruments contained the numbers and words: "6205 Red Pine" or "6205 Red Pine Ct." These recurring $2,450 monthly payments are not listed as campaign or PAC expenditures on any C&E Report.

81. The payments to E.L. evolved over time. From January to June 2017, the payments took the form of cashier's checks drawn on Bank of Nevada in the amount of $2,450 per month, with a remitter of Truth in Politics. An analysis of the TIP and FN accounts showed that in many instances, the date of the cashier's check was preceded in time by a check payment from FN to TIP, followed by a cash withdrawal for $2,456, just $6 over the exact amount on the cashier's check. Based on training and experience, I know some banks will charge between $5 and $10 for a cashier's check. The cashier's check for $2,450 was deposited into E.L.'s account on the same date it was drawn and is not listed on a C&E Report as a campaign or PAC expenditure.

82. From July to November 2017, the rent payments took the form of cashier's checks drawn on Wells Fargo in the amount of $2,450 each, with some of the checks listing Sheena Siegel as the remitter. None of the individual cashier's checks appears as a campaign or PAC expenditure on any C&E Report covering this period. Over the course of the same period that Siegel obtained the cashier's checks, Fiore wrote 37 checks from the

23

FN account to Sheena Siegel, totaling $44,600. The total rent payments for this period amounted to $12,250.

83. In December 2017, a cashier's check drawn on Chase Bank and dated December 15, 2017, and listing a remitter of Michele Fiore, was deposited into E.L.'s bank account. Financial records show that Fiore made a cash withdrawal of $2,000 from the FN account and a cash withdrawal of $1,562 from the TIP account, both occurring on date the cashier's check was drawn: December 15, 2017. There is no corresponding expenditure for these amounts on any C&E Report.

84. From January 2018 to April 2019, the pattern evolved into cashier's checks that were drawn on either Wells Fargo or Chase banks in the amounts of $2,450, where the cashier's check was immediately preceded in time by a $2,500 check payout from FFN to Siegel, which was shortly thereafter negotiated to cash. The exception to this pattern occurred in August 2018, with a $2,450 check written to E.L. from Fiore's personal account with Chase, and in February 2019, with a $1,500 check from Fiore's personal account accompanied by a $950 money order from Wells Fargo. None of the $2,450 payments during this period was recorded as a campaign or PAC expenditure on a C&E Report.

85. In May 2019, the primary method of rent payments transitioned from cashier's checks to money orders. The money orders -- creating the sum amount of $2,450 -- were purchased following cash withdrawals from FFN or checks written to Siegel/HE from the FFN account, which were then negotiated to cash.

86. On October 15, 2019, Fiore paid out $2,600 by a check written from FFN and deposited to HE. Siegel negotiated the check to cash on the same day of the purchase

24

of three money orders that totaled $2,450. All three of the money orders were then deposited into E.L.'s account. Each of the money orders listed the address "6205 Red Pine Ct.," handwritten in the address line and none of them was reported as a PAC expenditure on a C&E Report. In sum, the tracing of these transactions reveals payouts from FFN in the approximate total of $49,000, which were used to make at least 20 monthly rental payments to E.L.

87. From May 2019 to May 2020, a total of 36 money orders in amounts of $275, $450, and $1,000 were purchased from Check City and deposited into E.L.'s Chase Bank account. All these money orders list some variation of "6205 Red Pine Ct." in the address line and were deposited in the middle of the month. In each instance, the mid-month deposits of checks combined for a total of $2,450. The most common combination was two money orders for $1,000 and one for $450. As with the other payments, none of the money orders was reported as a PAC expense on a C&E Report.

88. A comparison of financial records of E.L.'s Chase account against records provided by Check City showed that the money orders were frequently purchased at different Check City locations throughout Las Vegas, but deposited into E.L.'s account on the same date of the money order. For example, records from Check City showed a money order for $450 and a money order for $1,000 purchased at one location and another money order for $1,000 purchased at a different location, all on the same date. On a least five occasions, images captured on CCTV at Check City during the time of these purchases showed Siegel making a purchase.

89. Records from Check City also showed that Siegel established an account with Check City in May 2019, the same month E.L.'s account began receiving money

25

orders as a form of rent payment. In the documents used to establish Siegel's account with Check City, the phrase "For Rent & other bills" is handwritten below a copy of Siegel's driver's license.

90. Based on the foregoing, there is probable cause to believe that Fiore and Siegel engaged in financial transactions of purchasing cashier's checks and money orders for the purpose of disguising the true source and nature of the funds as derived from the scheme to defraud of using campaign and PAC contributions for the personal use and benefit of paying Fiore's rent.

### Auto Loans

91. During the period from January 2017 to October 2019, Fiore made 12 payments to Drive Financial/Santander, for a total of $8,447, and seven payments to Ally Financial for a total of $5,614 using funds originating from FN and FFN. These payments took the form of online payments from Fiore's personal account at Chase Bank or telephone payments from Siegel's personal account at Wells Fargo. The above payouts to Drive Financial/Santander and Ally Financial were preceded by payouts from FN to TIP to Fiore's personal account, or payouts from FFN to Siegel's personal account. None of the payments toward the automobiles was listed as a campaign or PAC expenditure on a C&E Report.

92. By way of example, on June 26, 2017, Fiore conducted an online transfer from FN to TIP for $4,000. The same day, she deposited a check from TIP into her personal Chase account for $3,700. Following that deposit, Fiore conducted a series of online bill payments, including payments of approximately $750 to Drive Financial/Santander and approximately $800 to Ally Financial.

26

93. Records provided by Santander Consumer showed the company is the lien holder for a 2012 Jaguar sedan registered to Fiore. The records provided by Ally Financial showed the company was the lien holder for a 2012 Cadillac sedan registered to Lillian Fiore. The lien for the Cadillac was paid off in August 2018. The records from both lien holders confirmed that the payments were made from Fiore and Siegel's personal accounts.

### Airfare and Personal Trips

94. The financial analysis of the TIP and POTW accounts further revealed payouts from FN and FNN to TIP and/or to POTW that were used for downstream payments for airfare and personal trips that are consistent with personal use and benefit and inconsistent with political purposes or a political campaign. None of the expenditures below was listed as a campaign or political expenditure on a C&E Report.

95. **Personal travel to the Caribbean.** On June 9, 2017, Fiore made an online deposit into the TIP derived from payouts from FN for $4,800 and POTW for $1,500, for a total of $6,300. The $1,500 check payout from POTW was derived from a payout from FN on June 5, 2017, for $12,000.

96. Following the TIP deposit of $6,300, the next seven payouts from TIP, totaling approximately $6,300, were used to pay for rent, personal airfare to the Caribbean, fares on Majestic Cruise Lines, and purchases associated with the Flag Ship Service Organization ("FSSO"). The FSSO is a religious retreat for members of the Church of Scientology which take place on the Freewinds cruise ship. The Freewinds' home port is the island of Curaçao.

97. On July 24, 2017, Fiore paid out $3,400 from FN to TIP by making an online transfer. Following this payout, Fiore paid out $3,000 from TIP by making a check

27

deposit into her personal account with Chase Bank. After making the deposit into her personal account, Fiore made a series of purchases for personal use in the form of travel and utility expenses.

98.     Fiore then continued to use the TIP account to pay for personal benefits arising from a trip she made to the Caribbean between August 3 and 8, 2017. For example, TIP bank records show that on August 7, 2017, Fiore used the TIP debit card for two transactions, at the Curaçao Dolphin Academy, totaling $168. On August 8, 2017, Fiore posted a picture on her public Facebook account posing with a dolphin over a caption reading, "On a personal note, I'm taking a couple days for a little R&R this week, and I started it off yesterday morning with a kiss from Mosa."

99.     **Trip to Avalon, California.** From August 8 to 11, 2019, Fiore conducted three online transfers, totaling $1,200 from FFN to POTW. None of these transfers were reported on the C&E Reports. Financial records for POTW show that approximately $1,133 from the transfers was subsequently used for hotel fares and automated teller machine (ATM) cash withdrawals in Avalon, CA and Los Angeles, CA. There is no evidence suggesting Fiore's trip to Avalon, CA was for a political purpose or a political campaign.

<b><u>Utilities and Personal Items</u></b>

100.     Further financial analysis shows that Siegel, using the HE account, paid bills related to Fiore's living expenses with funds derived from campaign and PAC contributions. From September 2019 to December 2019, HE received $10,750 in payouts from FFN. Of the $10,750 in payouts, $7,650 was reported on the C&E Reports, leaving $3,100 unreported.

28

101. From September 2019, until March 2020, HE only received payments from entities controlled by Fiore, specifically FFN, FN, and a non-profit entity known as A Bright Present Foundation. Most of the payments made by checks written from these entities to HE were converted to cash shortly after being received.

102. On January 3, 2020, Fiore paid out $5,000 from her non-profit A Bright Present Foundation to HE. On the same day, Siegel withdrew $4,990 in cash from the HE account. The same day, Siegel made three cash deposits into her personal account with Wells Fargo, totaling $4,440. Three days later, on January 6, 2020, Siegel used her telephone to make a payment of $3,700 from her personal account to Fiore's personal Capital One credit card account.

**D.  Facts Connecting 6205 Red Pine Court to The Scheme to Defraud.**

103. I know from training and experience that statements, records, and correspondence relating to financial accounts, such as the bank accounts identified above, are either mailed in hard copy form to the mailing address associated with the account or sent via electronic mail to the email address associated with the account, or both. As previously indicated, the accounts associated with Fiore and the conduit entities list her residence as 6205 Red Pine Court.

104. The physical address listed for Michele Fiore on her C&E reports from 2017 into 2020 is 6205 Red Pine, Las Vegas Nevada, 89130. Fiore also lists the campaign headquarters location on the same form as 6205 Red Pine Ct. Las Vegas Nevada.

105. I know from training and experience that campaign activities are typically run from campaign headquarters thus making it probable that records of those activities,

29

including any records of activities by the conduit entities, is likely to be stored or kept at Fiore's campaign headquarters, listed as 6205 Red Pine Court.

**E.    Facts Connecting Electronic Devices to the Scheme to Defraud.**

106.    In addition to the facts recounted above, I know based on training and experience that individuals often store their personal electronic devices in their homes and offices, and often travel with portable electronic devices on their person. Therefore, computers, smartphones, and possibly other electronic storage media will be found within the Subject Premises and on the person of Michele Fiore and Sheena Siegel. As recounted above, the items to be seized include records likely to be stored on electronic devices.

107.    In addition to the above, the following further establishes probable cause to believe that electronic devices were used to effect the scheme the defraud.

**Internet Protocol and Digital Records**

108.    An Internet Protocol (IP) address is a numerical code that is assigned to a device when it connects to a computer network. IP addresses have the ability to be either static (fixed) or dynamic (changing) based on the network.  Some companies allow individuals/businesses to "lease" IP addresses for a period of time so that they remain static. Some of the banks involved in the investigation of this matter maintain records of the IP addresses customers use to access their online banking accounts.

109.    Returns from Cox Communications listed the IP address 68.224.102.172 as the assigned IP address for Michele Fiore at the 6205 Red Pine Ct. address, for the period February 13, 2018, to February 11, 2020. Cox Communications also identifies the IP

address 70.170.113.68 as being assigned to Fiore at the same address from February 11, 2020, to May 30, 2020.

110. From October 2, 2018, to February 7, 2020, the IP address 68.224.102.172 was recorded in WAB accounts approximately 1825 times. From February 14, 2020, to April 18, 2020, the IP address 70.170.113.68 was recorded in the WAB accounts approximately 288 times.

111. The IP address was recorded each time for the following events: device profiling, secure login, balance and deposit activity on the accounts. When recording IP addresses associated with balance and deposit actions on an account, WAB notes the account name in the description line. In this regard, FN, FFN, TIP, POTW and A Bright Present Foundation Inc. were repeatedly listed with the IP addresses 68.224.102.172 and 70.170.113.68. In the most recent subpoena to return from WAB, a device type is also recorded in the logs. There are two device types listed: "desktop" and "mobile web."

112. Internet protocol (IP) information provided by WAB identified three IP addressed associated with the three online transfers to fund Fiore's trip to Avalon:

      a.    $500 on August 9, 2019, shows an IP address of 107.77.227.31.

      b.    $500 on August 10, 2019, shows an IP address of 162.255.33.146.

      c.    $200 on August 11, 2019 shows an IP address of 107.77.229.77.

113. A WHOIS search of the IP addresses 107.77.227.31 and 107.77.229.77 identified AT&T Mobility LLC as owner of the specified IP addresses. Toll records from AT&T confirm that Fiore, using the cell phone number 702-985-8142, is a subscriber to AT&T. A WHOIS search of the IP address 162.255.33.146 identifies Santa Catalina Island Company, located in Avalon, CA, as the owner of the specified IP address. This

31

information, coupled with the timing of the online transfers, provides probable cause that Fiore conducted the online transfers while traveling in or near Avalon, CA.

114. I know from my training and experience the only way to conduct online banking is with an electronic device such as a computer, tablet, or cell phone/smartphone. The descriptions "desktop" and "mobile web" reveal the type of device used to conduct the online transfers. An electronic device such as a cell phone, smartphone, or tablet typically requires a "mobile web" version of the banking platform, whereas a computer would require the "desktop" version. Because the mobile web login routinely shares the same IP address as the desktop IP address (68.224.102.172 and 70.170.113.68), there is probable cause to believe that there was a Wi-Fi network inside of the residence 6205 Red Pine Ct. associated with the IP address 68.224.102.172, and later 70.170.113.68.

### Subject Device 1 and Subject Device 2

115. As recounted above, Fiore and Siegel used online transfers through and between the effected financial accounts in order to execute the scheme to defraud, thus making it probable that they used electronic devices, to include smartphones, desktop and laptop computers, and tablets, in the scheme to defraud. Electronic devices associated with smartphones used by or identified with Fiore and Siegel are delineated below as "Subject Device 1 and Subject Device 2," respectively.

116. Amazon purchase history further identifies the address 6205 Red Pine Ct. Las Vegas, NV, as the residence of Michele Fiore and the primary address for the entities she controls. Subpoena returns from Amazon show that orders placed using the email address michele@votefiore.com and customer name Michele Fiore are routinely shipped to 6205

32

Red Pine Ct. This includes purchases using debit cards associated with TIP, POTW, and FN.

117. For example, from September 4, to September 6, 2018, Fiore placed eight Amazon orders, totaling approximately $990 paid from the TIP bank account, using the TIP debit card. The original source of money used to cover these orders was a $1,000 payout from FFN to TIP, using and online transfer on September 4, 2018. Amazon records show the customer email, michele@votefiore.com, with the registered IP address as 68.224.102.172, was used to place the orders. The shipping address used for the orders 6205 Red Pine Ct. Las Vegas, NV. The billing phone number listed was 702-985-8142.

118. The items ordered are inconsistent with a campaign or PAC and consistent with personal use and benefits, consisting of toys, home décor, and personal beauty products.

119. In my training and experience the only way to order an item from Amazon is using an electronic device such as a computer, tablet, or cell phone/smartphone. Since the IP address is the same for all the orders, there is probable cause to believe that the IP address 68.224.102.172 is associated with an Internet network within the residence located at 6205 Red Pine Ct.

120. The IP information provided by WAB in association with the specified accounts spans from August 1, 2018, to September 28, 2019. As noted above, an IP address used to log on to the FFN account on May 24, 2019, was assigned to Fiore's residence at 6205 Red Pine Court. Additionally, IP addresses associated with AT&T are listed in connection with account activity approximately 96 times. In my training and experience,

33

this would indicate a cell phone(s) or smartphone with service provided by AT&T was used to access the specified accounts.

121. The same IP information provided by WAB also reveals the phone number 702-985-8142 was used on ten occasions for verification to conduct a secure login and account set-up. Toll records from AT&T confirm the subscriber for 702-985-8142 was Michele Fiore with a billing address of 6205 Red Pine Court, Las Vegas, NV. Based on the foregoing, there is probable cause to believe that 702-985-8142 is associated with an electronic device such as a cellphone or smartphone belonging to Michele Fiore ("Subject Device 1").

122. Similarly, IP information for the online activity of the HE bank account shows the number 702-290-3081, was used for verification to conduct a secure login. The phone number 702-290-3081 is also listed on the WAB signature card for the HE account, listing Sheena Siegel as the signatory. Based on this information, there is probable cause to believe that 702-290-3081 is associated with an electronic device such as a cellphone or smartphone belonging to Sheena Siegel ("Subject Device 2"), and there is probable cause to believe that Subject Devices 1 and 2 were used to conduct online banking activity to effect the scheme to defraud.

123. Further analysis of the toll records showed frequent communications between Subject Device 1 and Subject Device 2. Between January 2017, and April 2020, there were approximately 10,731 total contacts, texts messages and calls, between Subject Device 1 and Subject Device 2. Given the pattern of some of the transactions described above whereby Siegel uses funds derived from the FN and FFN accounts to pay personal

34

expenses of Fiore, there is probable cause to believe that Fiore and Siegel have communicated via Subject Device 1 and Subject Device 2 to effect the scheme to defraud.

124. Further, at approximately 10:29 a.m. on March 16, 2020, three money orders totaling $2,450, were purchased from a Check City in Las Vegas, NV. All three of the money orders listed "6205 Red Pine Ct." as the address and were later deposited into E.L.'ss bank account. A comparison of AT&T tolls records against the records provided by Check City showed that shortly before the purchase of two of the money orders on March 16, Subject Device 1 attempted to call Subject Device 2 at 10:00 a.m. PST, 10:15 a.m. PST, and 10:25 a.m. PST.

125. On October 14, 2020, the FBI conducted a physical surveillance of Fiore and Siegel. During the surveillance, FBI personnel observed Siegel depart Fiore's residence and drive to the Bank of Nevada (a WAB subsidiary), located at 8505 West Centennial Parkway, Las Vegas, NV. Siegel left the bank drive-thru teller at approximately 9:55 a.m. PST. The FBI surveillance personnel were unable to continue surveillance of Siegel following her departure from the bank. However, at approximately 10:28 a.m. PST, Siegel's image was captured on CCTV at Check City, located at 1990 Rainbow Boulevard, Las Vegas, NV, during the purchase of two money orders totaling $1,450. Google maps calculates an 11-minute travel time by vehicle from the West Centennial Bank of Nevada to Check City on Rainbow Boulevard. Records of the FN account show a $3,500 check written to cash on October 14, 2020.

126. CCTV footage provided by Check City showed Siegel using what appeared to be a cellular telephone or smartphone while purchasing the money orders on October 14, 2020. Siegel can also be observed on CCTV using what appeared to be a cellular

35

telephone or smartphone during a similar money order purchase at a Check City on June 15, 2020. Due to the numerous checks issued to Siegel from various accounts, and the rent payments made by Siegel using money orders, there is probable cause to believe that Fiore and Siegel have communicated via cellular telephone/smartphone during the course of the scheme to defraud.

**F.      Facts Concerning Electronic Devices and Electronic Storage Medium.**

127.    As used in this affidavit, an electronic device is a device which processes and stores electronic data, information, and communications by using an electronic program or optical, magnetic, mechanical, or other mechanism. This includes devices known as computers, cellular telephones, smartphones, portable audio devices, tablets, ipods, ipads, and the like.

128.    Electronic storage medium is a means by which data is stored by an electronic device and includes objects known as CD's, DVD's, hard drives, flash drives, floppy disks, and like objects capable of storing electronic data.

129.    I also know through training and experience that most smartphones, such as Apple iPhones or Samsung Galaxy Smartphones, used today are the equivalent of a traditional desktop or small computer, capable of performing many of the same functions such as storing and processing data, maintaining electronic files, and sending, receiving, storing, photographs, text messages, and emails. I also know that businesses and financial institutions develop applications (also known as "apps") that a user may download to a smartphone that will allow the user to use his or her smartphone to conduct financial transactions.

36

130. Based on my knowledge, training and experience, I know that individuals often store their personal electronic devices in their homes and offices, and often travel with portable electronic devices on their person. It is common for individuals to carry their electronic devices on their person in a pocket, purse, or backpack or in a case attached to a belt or other article of clothing. It is also common for individuals to carry or store electronic devices in vehicles, storage containers within vehicles (such as a glovebox) and in containers within a premises, such as a safe, file cabinet, or drawer. For all the reasons stated above, there is probable cause to believe that electronic devices were used in the scheme to defraud and will be located on the person of Sheena Siegel and Michele Fiore and on the premises to be searched, to include any outbuildings, vehicles, or safes located on the premises that may store electronic devices used in the scheme to defraud.

131. **Smartphones.** I also know from my training and experience that a smartphone (also referred to as a cellular telephone) is a handheld electronic device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these devices send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, email, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio

37

files; acting as an electronic notepad of contemporaneous notes; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

132.    Users of cellular telephones and smartphones increasingly choose to store items in digital form (e.g., pictures, documents) because digital data takes up less physical space and can be easily organized and searched. Users also choose to store data in their cellular telephones because it is more convenient for them to access data in devices they own, rather than to later spend time searching for it. Keeping things in digital form can be safer because data can be easily copied and stored off-site as a failsafe. Users also increasingly store things in digital form because storage continues to become less expensive. With cellular telephones, users can store data for years at little or no cost.

133.    Cellular telephone and smartphone files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone or smartphone can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, it remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space–that is, in space on the cellular telephone that is not allocated to an active file or that is unused after a file has been

allocated to a set block of storage space–for long periods of time before they are overwritten.

134.    In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a cellular telephone depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and cellular telephone habits.

135.    It is not possible to determine, merely by knowing the cellular telephone's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Electronic devices today can be simple cellular telephones and text message devices, and can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books, and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the Internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.

136.    Unlike typical computers, many cellular telephones and smartphones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some

solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

137. Based on the foregoing, there is probable cause to believe that communications, documents, and recorded events that were once stored on a cellular telephone or smartphone may still be stored there.

138. Forensic evidence on a cellular telephone or smartphone can also indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search of "indicia of occupancy" while executing a search warrant at a residence.

139. A person with appropriate familiarity with how cellular telephones and smartphones work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

140. Consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques including but not limited to computer assisted scans of the entire medium, that might expose many parts of

the device to human inspection in order to determine whether it is evidence described by the warrant.

141. **Electronic Files.** Based on my knowledge, training, and experience and discussions with other law enforcement agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

142. Also, again based on my training and experience and discussions with other law enforcement agents, wholly apart from user-generated files, electronic storage media— in particular, a computer's internal hard drives—contain electronic evidence of how an electronic device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.

143. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to

41

delete this information. Data on electronic storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about when the dates files were created and the sequence in which they were created.

144. As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as evidence of the Subject Offenses as described herein, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

145. Thus, the forensic analyst will require all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

42

146. In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smartphone may also have fingerprints on them indicating the user of the device and its components.

147. Similarly, files related to fraud found on computers and other digital communications devices are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

148. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. I

43

know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the place to be searched.

149. **Method of Searching Electronic Devices/Attachment C.** Searching the electronic devices for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.

150. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

151. Based upon knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all

44

electronic storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

152. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

153. The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

154. The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain

45

evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

155. Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

156. Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

157. **Attachment C:** Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review electronic devices and storage media on-site, the warrant I am applying for would permit seizing or imaging electronic devices and electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is

evidence described by the warrant. Consistent with this practice, the search will be conducted consistent with the protocols set out in Attachment C to the Warrant.

**CONCLUSION**

158. Based on the forgoing, I submit there is probable cause to believe that Michele Fiore, Sheena Siegel, and others working with them, engaged in a scheme to defraud as set forth herein in violation of the Subject Offenses. I further submit that based on the foregoing, there is probable cause to believe that evidence and instrumentalities of those violations as set forth in the items to be seized will be found in the places to be searched.

159. By separate pleading and for the reasons stated therein, I am requesting that this affidavit be placed under seal until further order of the Court.

160. This affidavit is incorporated in the Warrant and is to be read in conjunction with the Warrant in the course of the search and seizure authorized therein.

evidence described by the warrant. Consistent with this practice, the search will be conducted consistent with the protocols set out in Attachment C to the Warrant.

## CONCLUSION

158. Based on the forgoing, I submit there is probable cause to believe that Michele Fiore, Sheena Siegel, and others working with them, engaged in a scheme to defraud as set forth herein in violation of the Subject Offenses. I further submit that based on the foregoing, there is probable cause to believe that evidence and instrumentalities of those violations as set forth in the items to be seized will be found in the places to be searched.

159. By separate pleading and for the reasons stated therein, I am requesting that this affidavit be placed under seal until further order of the Court.

160. This affidavit is incorporated in the Warrant and is to be read in conjunction with the Warrant in the course of the search and seizure authorized therein.

I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

Cody Fryxell, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on January , 2021.

CAM FERENBACH

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

47

I hereby attest and certify on ___ 1-21-21 ___ that the foregoing document is a full true and correct copy of the original on file in my office, and in my legal custody.

CAM FERENBACH
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

By_____ Deputy Secretary

## ATTACHMENT A-1

### Description of Property/Premise to be Searched

**6205 Red Pine Ct., Las Vegas, Nevada.** This subject premise is a two-story, single family, stucco structure with two attached and enclosed garages. The subject premise is situated in a gated community, known as the Torrey Pines Estates. The building is used as a residence and business location. The structure is a tan colored building. The numbers "6205" appear on the front of the residence facing Red Pine Ct. The building sits on the west side of Red Pine Ct. and is the first house on the left when entering the community's only entrance. The main entrance faces south toward W. Azure Dr.

The premises to be searched include the main residence and all attached and unattached structures, attics, garages, and storage areas, and floor, wall and combination safes, and lockers, briefcases, containers, trash areas, surrounding grounds and outbuildings assigned to or part of the particular structure, as well as the person of Michele Fiore and Sheena Siegel as may be located at the premises at the time of the execution of this search warrant. The premises to be searched further include vehicles that are present on the curtilage of the property during the search.

Photographs of 6205 Red Pine Ct., Las Vegas, Nevada, are inserted below.









50







## ATTACHMENT A-2

### Description of Property to be Searched

The person of MICHELE FIORE, date of birth of July 29, 1970, Nevada Driver License Number 1602012533. Fiore's Nevada Driver's License states she is a 5'4" tall woman who weighs 140 pounds and has brown eyes and blond hair. Fiore's Driver's License photograph is below:



*Nevada Driver's License Photograph of Michele Fiore, dated July 28, 2015*

The search of Fiore shall include any and all clothing and personal belongings, electronic devices, backpacks, wallets, briefcases, purses, and bags that are likely to hold, store, conceal, and maintain the items to be seized and that are within Fiore's immediate vicinity and control at the time and place where she is found and the search warrant is executed. The search shall not include a strip search or a body cavity search.

52

## ATTACHMENT A-3

### Description of Property to be Searched

The person of SHEENA MARIE SIEGEL, date of birth of May 7, 1989, Nevada Driver License Number 1602202863. Siegel's Nevada Driver's License states she is a 5'4" tall woman who weighs 250 pounds and has brown eyes and brown hair. Siegel's Driver's License photograph is below:



*Nevada Driver's License Photograph of Sheena Marie Siegel, dated March 21, 2018*

The search of Siegel shall include any and all clothing and personal belongings, electronic devices, backpacks, wallets, briefcases, purses, and bags that are likely to hold, store, conceal, and maintain the items to be seized and that are within Siegel's immediate vicinity and control at the time and place where she is found and the search warrant is executed. The search shall not include a strip search or a body cavity search

53

# ATTACHMENT B

## Particular Things to be Searched For and Seized

I.  **Statutes Violated**

Potential violations of federal law include: Title 18, United States Code, Sections 1343 (Fraud by Wire) and 1956 (Money Laundering) as set forth fully in the Affidavit and referred to therein collectively, as the "Subject Offenses."

II.  **Description of Items to Be Seized**

All documents and communications that constitute evidence or instrumentalities of the violations listed as the Subject Offenses in Section I above and in the Affidavit, consisting of the following:

**For the period of July 2015, to Present:**

1.  All documents relating to the scheme to defraud as set forth in the affidavit.

2.  All documents relating to any financial transaction arising from the scheme to defraud as set forth in the affidavit.

3.  All documents related to the proceeds of the scheme to defraud as set forth in the affidavit.

4.  All documents related to the disposition of the proceeds of the scheme to defraud as set forth in the affidavit.

5.  All documents related to the acquisition of property with the proceeds of the scheme to defraud as set forth in the affidavit.

**(CONTINUED ON NEXT PAGE)**

54

**Page 2 of Attachment B**

6. All communications relating to the scheme to defraud as set forth in the affidavit.

7. All communications relating to any financial transaction arising from the scheme to defraud as set forth in the affidavit.

8. All communications related to the disposition of the proceeds of the scheme to defraud as set forth in the affidavit.

9. All electronic devices used in the scheme to defraud as set forth in the affidavit, including devices associated with telephone numbers 702-985-8142 and 702-290-3081.

10. All documents relating to ownership, use, and operation of electronic devices used in the scheme to defraud as set forth in the affidavit, including the electronic devices associated with telephone numbers 702-985-8142 and 702-290-3081.

11. All communications relating to electronic devices used in the scheme to defraud as set forth in the affidavit, including the electronic devices associated with telephone numbers 702-985-8142 and 702-290-3081.

12. All documents related to any electronic devices used in the scheme to defraud as set forth in the affidavit, including the electronic devices associated with telephone numbers 702-985-8142 and 702-290-3081.

(CONTINUED ON NEXT PAGE)

55

**(CONTINUED FROM PREVIOUS PAGE)**

**Page 3 of Attachment B**

13. All documents and communications related to lease agreements for 6205 Red Pine Court, Las Vegas, NV.

14. All documents and communications related to invoices for goods or services provided by Hamlet Events.

15. All documents and communications related to invoices for goods provided to or services performed for the Fiore for Nevada campaign.

16. All documents and communications related to invoices for goods or services provided to the Future for Nevadans, PAC.

17. All documents and communications related to goods or services provided by Sheena Seigel.

18. All documents and communications with Sheena Seigel related to payments of money to or from Fiore for Nevada, Future for Nevadans, Truth in Politics, or Politically Off the Wall.

**(CONTINUED ON NEXT PAGE)**

Page 4 of Attachment B

For purposes of this Warrant:

The word "**communication**" is defined as the exchange and/or transmission of thoughts, messages, ideas, concepts, or the like by use of letters, words, signals, or signs transmitted by any means, including, without limitation, paper or letter correspondence, notes, memos, marginalia, and electronic transmissions and signals commonly referred to as e-mail, text messages, instant messages, tweet, voice-mail, voice-messaging, private messages, video calling history, "Friend" requests, status updates; Instagram messages, electronic recordings, or other electronic means of transmitting information, including all associated metadata if stored and/or recorded in an electronic storage medium.

The word "document" is defined as any information, communication, data, datapoint, or historical event recorded in any form or medium (paper or electronic), including, without limitation: email, SMS, chat message, phone call record, activity logs, photographs, status updates, comments, "Friend" lists, "Friend" requests, "News Feed information," IP logs, location monitoring data, "Neoprint," photographs, videos, "likes," chat histories, gifts, pokes, tags, memoranda, letters, transmittals, notes, compilations, summaries, charts, receipts, invoices, bills, deposit slips, bank statements, checks (front and back), forms, ledger entries, journal entries, diary entries, calendar entries, database entries, drawings and/or diagrams, and any and all associated metadata associated with information stored and/or recorded in an electronic storage medium.

The words "**electronic device**" mean a device which processes and stores electronic data, information, and communications by using an electronic program or optical, magnetic, mechanical, or other mechanism. This includes devices known as computers, cellular telephones, smartphones, portable audio devices, tablets, ipods, ipads, and the like.

The words "**electronic storage medium**" means any medium by which data is stored by an electronic device and includes objects known as CD's, DVD's, hard drives, flash drives, floppy disks, and like objects capable of storing electronic data.

**This Warrant expressly incorporates the Affidavit submitted in support of the Warrant, and separately sealed, as though set forth fully herein.**

**ATTACHMENT C**

**PROTOCOL FOR SEARCHING THE ELECTRONIC DATA SEIZED**

**PURSUANT TO THIS SEARCH WARRANT**

1. In executing this warrant, the Government must make reasonable efforts to use methods and procedures that will locate and expose in the electronic data produced in response to this search warrant ("the Search Warrant Data") those categories of data, files, documents, or other electronically stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

2. When the Search Warrant Data is received, the Government will make a duplicate copy of the Search Warrant Data ("the Search Warrant Data Copy"). The original version of the Search Warrant Data will be sealed and preserved for purposes of: later judicial review or order to return or dispose of the Search Warrant Data; production to the defense in any criminal case if authorized by statute, rule, or the Constitution; for purposes of showing the chain of custody of the Search Warrant Data and the Search Warrant Data Copy; or for any other lawful purpose. The original of the Search Warrant Data will not be searched or examined except to ensure that it has been fully and completely replicated in the Search Warrant Data Copy.

3. The investigating agents will then search the entirety of the Search Warrant Data Copy using any and all methods and procedures deemed appropriate by the United States designed to identify the information listed as Information to be Seized in Attachment B. The United States may copy, extract or otherwise segregate information or data listed as Information to be Seized in Attachment B. Information or data so copied,

58

extracted or otherwise segregated will no longer be subject to any handling restrictions that might be set out in this protocol beyond those required by binding law. To the extent evidence of crimes not within the scope of this warrant appear in plain view during this review, a supplemental or "piggyback" warrant will be applied for in order to further search that document, data, or other item.

4.     Once the Search Warrant Data has been thoroughly and completely examined for any document, data, or other items identified in Attachment B as Information to be Seized, and no later than 120 days from the execution of the search warrant, the Search Warrant Data Copy will then be sealed and not subject to any further search or examination unless authorized by another search warrant or other appropriate court order. The Search Warrant Data Copy will be held and preserved for the same purposes identified above in Paragraph 2.

5.     The search procedures utilized for this review are at the sole discretion of the investigating and prosecuting authorities, and may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.     examination of all of the data contained in the Search Warrant Data to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover from the Search Warrant Data any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4)

59

otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.    surveying various file directories and the individual files they contain;

    d.    opening files in order to determine their contents;

    e.    using hash values to narrow the scope of what may be found. Hash values are under-inclusive, but are still a helpful tool;

    f.    scanning storage areas;

    g.    performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

    h.    performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

**Return and Review Procedures**

6. Federal Rule of Criminal Procedure 41 provides, in relevant part:

. . .

(e) Issuing the Warrant.

. . .

(2) Contents of the Warrant.

(A) Warrant to Search for and Seize a Person or Property. Except for a tracking-device warrant, the warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned. The warrant must command the officer to:

(i) execute the warrant within a specified time no longer than 14 days;

. . .

(B) Warrant Seeking Electronically Stored Information. A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

. . .

(f) Executing and Returning the Warrant.
    (1) Warrant to Search for and Seize a Person or Property.

. . .

        (B) Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. . . . In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.

. . .

7.    Pursuant to this Rule, the government understands and will act in accordance with the following:

a.    Pursuant to Rule 41(e)(2)(A)(iii), within fourteen (14) days of the execution of the warrant, but no later than any return deadline specified in the warrant, if earlier, an agent is required to file an inventory return with the Court, that is, to file an itemized list of the property seized. Execution of the warrant begins when the United States serves the warrant on the named custodian, in the case of data held by a third-party service provider, or when the United States begins copying a complete forensic image of the target electronic device, in the case of data contained within an electronic device; in either case, execution of this warrant is complete when the United States obtains a complete copy of the Search Warrant Data. Within fourteen (14) days of completion of the execution of the warrant, but no later than any return deadline specified in the warrant, if earlier, the inventory will be filed with the Court.

b.    Pursuant to Rule 41(e)(2)(B), Rule 41(e)(2)(A) governs the time within which the electronically stored information must be seized after the issuance of the warrant and copied after the execution of the warrant, not the "later review of the media or information" seized, or the later off-site digital copying of that media.

61

c. Under Rule 41(f)(1)(B), the inventory return that is to be filed with the court may be limited to a description of the "physical storage media" into which the Search Warrant Data that was seized was placed, not an itemization of the information or data stored on the "physical storage media" into which the Search Warrant Data was placed;

d. Under Rule 41(f)(1)(B), the government may retain a copy of that information for purposes of the investigation. The government proposes that the original storage media on which the Search Warrant Data was placed plus a full image copy of the seized Search Warrant Data be retained by the government.

e. If the person from whom any Search Warrant Data was seized requests the return of any information in the Search Warrant Data that is not set forth in Attachment B, that information will be copied onto appropriate media and returned to the person from whom the information was seized.

**EXHIBIT C**

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
Te

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:

     **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | Date and Time: |
|---|---|
|  |  |

**YOU MUST** also bring with you the following documents, electronically stored information, or objects (blank if not applicable):

Date: _____

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States Attorney, or Assistant United States Attorney, who requests this subpoena, are:

AO 110  (Rev. 06/09)  Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* _____
was received by me on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# RECORDS REQUESTED:

For the time period of January 1, 2017 to present, as it relates to the entity or organization referred to as Future for Nevadans:

- Any and all books, ledgers, and accounting entries related to business receipts, revenue, and expenditures for Future for Nevadans;
- Any and all income statements, statements of goods sold, balance sheets, and statements of cash flows related to Future for Nevadans;
- Any and all planners, schedules, and calendar entries related to events associated with the Future for Nevadans;
- Any and all bank records, bank statements, deposits, or receipts related to financial accounts related to Future for Nevadans;
- Any and all documents related to individuals/entities performing services for or on behalf of Future for Nevadans
- Any and all records supporting Contributions and Expenses Reports submitted to the Office of the Nevada Secretary of State;
- Individual and entity name(s) and addresses associated with the filing of Contribution and Expense Reports on the behalf of Future for Nevadans;
- Any and all documents relating to communications with the Office of the Nevada Secretary of State.
- Any and all documents related to the following individuals and entities:
  - Truth in Politics The Magazine, LLC: NV20151582036
  - Politically Off the Wall, LLC: NV20171114365
  - A Bright Present Foundation, INC: NV20191526242
  - Hamlet Events, LLC: NV20181744230
  - Fiore for Nevada
  - Sheena Siegel (DOB 05/07/1989, SSN 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)
  - Savannah Willis (DOB 12/20/1993, SSN 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)


For questions about this subpoena contact:
    Special Agent Cody Fryxell
    FBI Las Vegas Division
    702-584-5549 desk
    702-236-8021 cell cffryxell@fbi.gov

# SUBPOENA ATTACHMENT FOR ESI FINANCIAL RECORDS

INSTRUCTIONS FOR THE PRODUCTION OF RECORDS

I. General
- A. Records existing as Electronically Stored Information (ESI) shall be produced in electronic form and shall include text data and image data held:
    1. In your record retention systems; and/or
    2. By your technology, data, or other service provider(s).
- B. Records that do not exist as ESI may be produced in paper or other original format and may be converted to image or text data and provided as ESI, unless originals are required.

II. Text Data
- A. Text data relating to transactions shall be produced within a data file:
    1. Using a delimited ASCII text data format: or
    2. Using software that can export to a commonly readable, non-proprietary file format without loss of data.
- B. Text data files relating to transactions shall include field descriptions (e.g. account number, date/time, description, payee/payor, check number, item identifier, and amount).

III. Image Data
- A. Image data shall be produced in graphic data files in a commonly readable, non-proprietary format with the highest image quality maintained.
- B. Image data of items associated with transactions (e.g, checks and deposit slips) shall be:
    1. Produced in individual graphic data files with any associated endorsements; and
    2. Linked to corresponding text data by a unique identifier.

IV. Encryption/Authentication
- A. ESI may be transmitted in an encrypted container. Decryption keys and/or passwords shall be produced separately at the time the data are produced.
- B. Authentication, such as hash coding, may be set by agreement.
- C. Affidavits or certificates of authenticity may be included as part of the electronic production.

V. Cost Reimbursement

Costs that are reasonably necessary and have been directly incurred in searching for, reproducing, and transporting records may be reimbursable. See the *Right to Financial Privacy Act*, 12 U.S.C., Section 3415, and Federal Reserve Board *Regulation S*, 12. C.F.R., Part 219 (revised effective 1/1/2010

## **NON-DISCLOSURE**

PLEASE DO NOT DISCLOSE THE EXISTENCE OF THE ACCOMPANYING GRAND JURY SUBPOENA FOR AN INDEFINITE PERIOD.  PURSUANT TO RULE 6 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, YOU HAVE NO OBLIGATION OF SECRECY CONCERNING THIS SUBPOENA; HOWEVER, ANY SUCH DISCLOSURE COULD OBSTRUCT AND IMPEDE AN ONGOING CRIMINAL INVESTIGATION AND THEREBY INTERFERE WITH THE ENFORCEMENT OF THE LAW.

## **AFFIDAVIT OF CUSTODIAN OF RECORDS**

I, _____, being first duly sworn, depose, and say:

1.     I am over the age of twenty-one (21) years and fully competent to testify to the statements made in this Affidavit in a court of law.

2.     The statements made in this Affidavit are true to the best of my own personal knowledge, except those made upon information and belief, and, as to those statements, I believe them to be true.

3.     I am a custodian of records for _____.

4.     I hereby certify that the records attached hereto is a true and correct copies of the original records maintained and created in the ordinary course of business of _____ responsive to the subpoena issued by the Federal Grand Jury.

5.     I hereby certify that the records attached hereto: (A) were made at or near the time of the occurrence by, or from information transmitted by, a person with knowledge of the matters set forth therein; (B) were kept in the course of regularly conducted activity; and, (C) as a regular practice, such records are made in the regularly conducted activities of_____.

FURTHER your Affiant sayeth naught.

Signature: _____

Print Name: _____
                     Affiant

SUBSCRIBED and sworn to before me

this _____day of _____, 2020

_____
Notary Public